

Mailing Address:  
P.O. Box 18109  
Oklahoma City, OK 73154

Phone: 800-207-7661 | 405-528-4490  
Fax: 405-576-3189  
www.tbsfactoring.com

**Factoring Checklist – What We Need:**
- ✓ Fully Completed & Signed Application with Terms of Service Acknowledgement
- ✓ Voided Check for Payment Processing
- ✓ Certificate of Insurance
- ✓ Copy of Driver's License(s)
- ✓ Motor Carrier Authority Letter
- ✓ IRS Form 8821
- ✓ Fuel Card Agreement (if applicable)

# COMPANY PROFILE

*(Please fill in all information accurately and completely with full legal name and information to avoid processing delays; TBS reserves the right to make corrections to misspelled names (to match DL's), and incomplete company legal names, dba's and other necessary corrections to preserve TBS's interest).*

### Company Information (Desired Name):

| PHASE ONE SERVICES LLC | PHASE ONE LOGISTICS |
|---|---|
| Company Name (Full Legal Name) | DBA |

(Please send your certificate AND Articles for LLC/Inc/Partnership)

| Contact Name: Ashley Williams | Phone: 832-931-0871 | | |
|---|---|---|---|
| 7544 FM RD E PMB10002 | HUMBLE | TX | 77346 |
| Physical Address (No P.O. Box) | City | State | Zip |
| 7544 FM RD E PMB10002 | HUMBLE | TX | 77346 |
| Mailing Address (if different) | City | State | Zip |
| 832-931-0871 | | | |
| Telephone (include Area Code) | Fax (include Area Code) | Cell (include Area Code) | |
| 82-4155551 | 3199923 | 166410 | trucks@phaseonelogistics.com |
| Federal ID Number | DOT Number & Pin | MC Number & Pin | Email address |

[initials: C AW]

**INITIAL HERE TO OPT-IN TO RECEIVE TEXT MESSAGES**. By initialing this box, I authorize TBS Factoring Service, LLC and its affiliates to send me text messages (to the number inserted below) about my account, updates, special offers, and general TBS news. I hereby release and agree to hold harmless TBS Factoring Service, LLC and its affiliates from any and all claims and demands arising out of or in connection with such text messages. I certify that I am over the age of thirteen (13) and am legal authorized to agree to these terms. Mobile text messages are intended for subscribers over the age of 13 and are delivered by USA short code 95577. Your normal carrier rates and fees apply for text and data. For help, text "HELP" to 95577. You may stop your mobile subscription at any time by texting "STOP" to code 95577.

| Name | Ashley Williams | Mobile Number | 832-931-0871 | Authorization Date | 07/20/2020 |
|---|---|---|---|---|---|

*On the next page, please list each owner, director, member, principal, partner, agent, or otherwise of the Company separately based on entity structure and formation - all information is required to process your application.*

EXHIBIT A

**_Company Principal/Ownership:_**  Majority

| | |
|---|---|
| Ashley Williams | Manager |
| **First Name (First, Middle, Last)** | **Title** |
| 7544 FM RD E PMB10002 | HUMBLE, TX 77346 |
| **Home Address** | **City, State, Zip Code** |

| | | | | |
|---|---|---|---|---|
| 832-931-0871 | 7/11/1986 | 17151019 | TX | 7/11/2022 |
| **Home Phone** | **Date of Birth** | **Driver's License Number** | **Issuing State** | **Expiration Date** |

| | |
|---|---|
| | 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 |
| **Rent or Own** | **Social Security Number** |

## AUTHORIZATION

*(This is a legally binding document and should be carefully read and reviewed before signing).*

### Investigation Check and Service Terms Authorization

I/We understand that the submission of this factoring application and signed authorization with TBS Factoring Service, LLC ("**TBS**") and completion of the company profile for the undersigned client / company ("**Company**" or "**Client**") authorizes TBS to process this application and perform the necessary background and credit checks to determine your qualifications to meet our underwriting and financial guidelines; however, by completing this application and signing this Authorization, it does not mean that TBS will factor loads or provide any financial services to you or to the Company identified. All services are contingent upon TBS's review, verification, and final written approval. By completing, submitting, and signing this factoring application and Authorization, the undersigned verifies and hereby authorizes TBS to run a background and credit check on the above-named Company (including all principals listed) for the purpose of determining the eligibility for services and/or to obtain any other necessary information or documentation to conduct a credit and/or background investigation.

### Signature Authorization – Authorized Signors for Company

The undersigned represents that they are an authorized owner, officer, manager, principal, partner, member, and/or agent of the named Company and herby certifies that the following persons, (whose names and titles appear below) are duly authorized to act with full authority for said Company in all transactions, assignments, purchases, transfers, sales, and all other business dealings and transactions with TBS in the manner and to the extent specified in the Terms of Service. Such persons are duly qualified and are acting in their respective capacities as authorized by the Company. The Company agrees to immediately notify TBS if any named person below ceases to occupy the designated position or is no longer authorized to act on behalf of Company. Further, Company agrees to immediately notify TBS of any successor persons authorized to act on Company's behalf. TBS may rely on the authorities designated herein and shall have no liability to the Company or to any other persons for such reliance. Company must properly notify TBS of designated authority changes and such notifications shall not be effective, unless in writing and given at least two (2) business days prior to effectuate the change. The persons named below represent that they are duly authorized to act and make decisions on behalf of the Company and to bind the Company to documented agreements, terms, and conditions.

| **Last Name** | **First Name** | **Position** |
|---|---|---|
| Williams | Ashley | Manager |

**Company Legal Name / Client Name:** PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS



**BY INITIALING HERE I APPROVE THE INVESTIGATION CHECK, SERVICE TERMS AND AUTHORIZED SIGNORS**.

# SCHEDULE A – DISCOUNT SCHEDULE

This Schedule A – Discount Schedule incorporates by reference and is incorporated by reference into the Accounts Receivable Purchase and Security Agreement Terms and Conditions, ("**Terms of Service**"), a copy of which has been provided to you with this application. Capitalized words used in this Discount Schedule shall have the meaning given to them in the Terms of Service.

**Non-Recourse** (Under the non-recourse program, TBS assumes the risk. If your debtor defaults, then you will not be responsible. However, this program does not eliminate your responsibility for any payment discrepancies, including warranties, fees or other charges).

**Six (6) Months** (Selecting this option results in a higher rate because of the shorter Term. The Terms of Service will auto-renew on the same terms and requires at least 30-days written notice to TBS prior to the end of the then-current term).

| ITEM DESCRIPTION | RATE / FEE |
|---|---|
| TBS Rate Per Purchased Account | For each Account purchased by TBS, TBS shall earn a fee of **Four Point Five** percent (4.5 % ) of the face value (e.g. full invoice amount) of each Account purchased, in addition to any other agreed upon deductions, charge-back amounts, fees, and expenses per the Terms of Service and agreement of the Parties. |
| Unauthorized Advances or Client Deposits Funds Due to TBS | Client shall not accept any advances on purchased Accounts from any other party; if Client accepts funds from the debtor or other third-party, then Client shall IMMEDIATELY remit all advanced funds received to TBS, plus a twenty-five percent (25%) convenience fee based on the advanced amount received by Client and remit to TBS.<br>If Client deposits any funds or sums of money due TBS, or if Client causes funds to be misdirected or misapplied, which are due to TBS, then Client shall IMMEDIATELY cause all such funds received, plus a fifteen percent (15%) processing fee (based on the amount wrongfully deposited, misdirected, or misapplied by Client) to be remitted to TBS.<br>*(For either (1) or (2), TBS reserves the right to charge such amounts back to Client or charge such amounts against Client's bank account on record with TBS for such purposes).* |
| Early Termination Fee | See Paragraph 12 of the Terms of Service. |
| UCC-3 Release | $225.00 release fee will be charged to Client per each UCC-3 release requested and/or required upon fulfillment of Client's obligations under the Terms of Service. (This is a release of the UCC-1 Financing Statement filed granting TBS a security interest in the Collateral). |
| Post Termination Fees for Continued Account Processing | If TBS is required to process any released Accounts following TBS's termination of the Terms of Service following a period of thirty days (30), TBS will either charge a $20.00 fee to process the check or return the funds directly to the account debtor. (Client has the sole responsibility to notify debtors in changes on their Accounts). |

By signing this Discount Schedule, the undersigned is binding the Company / Client to the referenced Terms of Service, this Discount Schedule with applicable pricing and fees, and all other terms of the Parties documented relationship. In the event of a conflict in the Terms of Service and this Discount Schedule, this Discount Schedule will control.

**Authorized and Signed By:** *Ashley Williams*　　　**Date:** 7/20/2020

**Printed Name:** Ashley Williams　　　**Title:** Manager

*Mailing Address:*
P.O. Box 18109
Oklahoma City, OK 73154



Phone  800-207-7661 • 405-528-4490
Fax  405-488-1999
www.tbsfactoring.com

**Attention: Accounts Payable**                                      **Date:** July 20, 2020

## NOTICE OF ASSIGNMENT AND CHANGE OF PAYEE

We are pleased to inform you that we have established a business relationship that provides PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS**,** ("**Client**") with working capital. Accordingly, Client has assigned all of its present and future accounts receivable with your company to TBS Factoring Service, LLC ("**TBS**").

This letter hereby authorizes and instructs you to remit your payment of all invoices from Client directly to TBS, and to continue to do so until notified otherwise by TBS.

Payments made to any party except TBS, will not relieve your obligation for accounts payables TBS, and this notice may not be revoked except in writing by an officer of TBS.

Please make your checks payable to, and send them to:
    TBS Factoring Service, LLC
    FBO: PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS
    DOT#: 3199923
    MC#: 166410
    P.O. Box 248920
    Oklahoma City, OK 73124-8920

Wire/ACH Remit to:
Bank Name: MidFirst Bank
Bank ABA: 303087995

Bank Account Number: 5201031538
*Please send a remittance with TBS load number, Client name, PO number to:*
**remittances@tbsokc.com**

Your cooperation is appreciated. We look forward to working with you.  Please keep a copy of this letter for your records. Should you have any questions, please call TBS at 1-800-207-7661.

**PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS**                                      **TBS Factoring Service, LLC**

*Ashley Williams*                                                                                         *Christine Dunn*
Signed By:

Printed Name:   Ashley Williams                                      Christine Dunn, Director of Underwriting

Title:   Manager

Dated:   July 20, 2020

## DELIVERY OF FUNDS

**CLIENT:** PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS     **TIN/EIN#** 82-4155551

**All Payments will default to an ACH electronic direct deposit** ($3.00; 24-48 hours to appear in your account)
*You will be able to choose a different form of payment with every load you submit to be paid on your Exhibit B*

Name of Bank: **Navy Federal**

Bank Address: **10011 Farm to Market 1960 Bypass Rd W, Humble, TX 77338**

Bank Phone #: **888-842-6328**

Bank Routing #: **256074974**

Bank Account #: **7106665800**

Name(s) on Acct: **Phase One Services LLC**

Type of Account: **Checking**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I hereby authorize TBS Factoring Service, LLC, ("TBS") to debit and/or credit the account and financial institution named on this form for purposes of my obligations under the Terms of Service and agreements signed with TBS. Furthermore, this authorization shall remain in effect until all Client obligations (including all sums of money due to TBS related to TBS's relationship with Client), have been fulfilled and written notification canceling this authorization is given and granted. TBS reserves the right to request and receive a copy of a voided check from the account identified herein as additional verification. The undersigned represents and warrants that they are duly authorized to sign this Delivery of Funds and make the designations herein on behalf of the named Client / Company.

Signed: *Ashley Williams*     Date: 7/20/2020

Printed Name & Title: Ashley Williams     Manager

# EXHIBIT (C)

## By and between
## TBS Factoring Service, LLC (Factor) and PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS (Company)

This agreement, by and between the above named parties, amends and adds to the certain factoring agreement above referenced herein. All other terms and conditions of the factoring agreement above referenced will remain in full force and effect unless specifically contradicted or repealed in this exhibit.

WHEREAS, the parties have executed an Account Receivable Purchase Agreement dated July 20, 2020 on a non-recourse basis, and;

WHEREAS, the parties desire to supplement and amend said agreement to provide as follows:

1. That any and all Accounts purchased by Factor generated by Company to the account debtor CH Robinson Worldwide (MC# 131029) shall be purchased at an initial advance rate of 98.00%.

2. That any and all Accounts purchased by Factor generated by Company to the account debtor Total Quality Logistics (MC# 322572) shall be purchased at an initial advance rate of 97.00%.

3. That any and all Accounts purchased by Factor generated by Company to the account debtor Coyote Logistics, LLC (MC# 561135) shall be purchased at an initial advance rate of 97.00%

4. That any and all Accounts purchased by Factor generated by Company to the account debtor JB Hunt (MC# 135797) shall be purchased at an initial advance rate of 98.50%

5. That all other terms and provisions of the factoring agreement by and between the parties referenced herein shall remain in full force and effect and shall be unaltered by this amendment.

TBS FACTORING SERVICE, LLC

By: _Wood Kaufman_ (signature)
Print Name: Wood Kaufman
Title: Member
Date:  7/20/2020

Sent By: Rick Puglisi

Processed by: _____

PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS

By: _Ashley Williams_ (signature)
Print Name: Ashley Williams
Title: Manager
Date: July 20, 2020

# **ADVANCE PAYMENT PROGRAM**

Company Name (full Legal Name): PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS

TBS Factoring Service, LLC (TBS) is pleased to offer advances to our valued clients.

TBS may advance up to 40%/50% on loads hauled for brokers or shippers approved for factoring. Advances will be scheduled for funding by TBS within 4 hours after the cargo is loaded and all required paperwork is submitted to TBS (during TBS normal business hours). Advances will be funded by bank wire or the exclusive TBS fuel card provider.

Advances will be given only when requested by the person who has the factoring contract with TBS or persons designated in writing by the contract holder.

## WHAT ARE THE ADVANCE FEES?

- Fees will be deducted from the advance prior to funding.
- $19.99 for a 40% Advance, or $24.99 for a 50% Advance.
- To request a bank wire there will be a $12 Bank Wire fee. Transfer onto a Comdata of EFS fuel card is free.

## WHAT IS REQUIRED FOR A TBS ADVANCE?

- A signed Accounts Receivable Purchase Agreement
- Load Documents including the rate sheet, and the Bill of Lading for the load on which the advance request is made.
- TBS Advance Request Form properly filled out.

## REQUIREMENTS

- No other advance may be taken on a load advanced by TBS (prior to or after the TBS Advance). A $200 fee will be charged against the carrier if an advance from another source is taken on a load advanced by TBS.
- Original signed paperwork providing proof of delivery must be delivered to TBS for factoring within seven (7) calendar days of subject advance funding, and the load must be clear of defects. A $200 fee will be charged against the carrier if these requirements are not met.
- TBS Factoring Service, LLC reserves the right to refuse to advance on any load at their sole discretion.
- Any advances outstanding more than seven (7) calendar days will be charged back against new load submitted to TBS for purchase, regardless is such loads match loads upon with the advance funding was based.
- TBS Factoring Service, LLC may cancel this agreement with 24-hour notice to carrier or carrier's representative at the sole discretion of TBS without affecting other factoring contract terms.

## HOW IS THE ADVANCE TAKEN FROM THE FACTORED LOAD?

- The load will be factored at 100% of the rate quoted on the customer Rate Sheet and verified by the customer.
- The advance amount will be deducted from the factored amount owed to the carrier after applicable fees are assessed.

Having Read and Understood and Agreed to this Document, the parties hereto have executed this agreement.

By: *Wood Kaufman* (signature)
Name: Wood Kaufman
Title: Managing Member

Date: July 20, 2020

PHASE ONE SERVICES LLC DBA PHASE ONE LOGISTICS
**Company Name (Full Legal Name)**

*Ashley Williams* (signature)
**Authorized and Signed By:**
Ashley Williams
**Printed Name:**
Manager
**Title**
July 20, 2020
**Date Signed**

## ACCOUNTS RECEIVABLE PURCHASE AND
## SECURITY AGREEMENT TERMS AND CONDITIONS

This Accounts Receivable Purchase and Security Agreement Terms and Conditions (hereinafter "**Terms of Service**") sets forth the terms and conditions of the factoring services provided by TBS Factoring Service, LLC ("**TBS**") to you as the client (hereinafter referred to as "**You,**" "**Your**," "**Company**," or "**Client**"). These Terms of Services are binding upon You and shall govern the relationship You have with TBS as a client of TBS. These Terms of Service may be changed, altered, amended, or revised from time to time upon posting of the Terms of Service on the applicable TBS legal webpage located at TBSFactoring.com. These Terms of Service are binding and effective upon You as set forth in the applicable schedule or upon the date You first accept services from TBS, whichever comes first ("**Effective Date**"). TBS and Client may be referred to in these Terms of Service as a "**Party**" or collectively as the "**Parties**."

As a Client of TBS, You agree to the following:

1.  **Services**. TBS is in the business of reviewing and purchasing selected accounts receivable from businesses and professional companies and entities. Client is in the business of "for-hire transportation" and desires to sell selected accounts receivable to TBS on the terms and conditions set forth in these Terms of Service. The Parties agree that for the consideration contained in these Terms of Service, that each of the Parties will perform its respective obligations hereunder.

2.  **Assignment of Accounts**. Client hereby agrees to sell, assign, transfer, convey, and deliver the agreed upon accounts receivable to be factored, (the "**Accounts**") exclusively to TBS. Upon agreement to purchase, TBS receives all right, title, and interest in the Accounts, which are due to Client from its customers, shippers, and other agreed upon debtors and business associates, (collectively "**Client Customers**"). Client represents and warrants that the Accounts are legitimate commercial Accounts and are not in any way affiliated with any of Client's owners, employees, or representatives. All Accounts will be legally binding accounts receivable owed to Client and Client shall sign a notice of assignment and change of payee document on behalf of TBS for purposes of enabling TBS to collect on the Accounts. Client shall not interfere or circumvent such notice of assignment and agrees that any such interference or circumvention shall be considered fraudulent activity on the part of Client and a default of this agreement. No agency, partnership, joint venture, or employment is created as a result of this Agreement and Client does not have any authority of any kind to bind TBS in any respect whatsoever.

3.  **Account Submission**. Notwithstanding anything in these Terms of Service to the contrary, TBS reserves the sole right and discretion to reject any Account from purchase. Prior to the purchase of any Account(s) by TBS, Client shall submit the Accounts to TBS for review, verification, and approval. When submitting Accounts or other similar billing statements (collectively the "**Invoices**") for possible purchase by TBS, the Client shall forward to TBS the following: (a) the original and/or one copy of each such Invoice as mutually agreed;  (b) a properly executed Schedule of Accounts, (as defined below in this section), prepared on an approved form provided by TBS; (c) a carrier settlement sheet (broker clients only); (d) all supporting and accessorial documentation required for payment, as required by TBS; and (d) any other documents, authority, or information reasonably requested by TBS. The "Schedule of Accounts Form" is a schedule listing the Accounts for purchase also referred to as an **"Exhibit B"**, which shall be updated and signed by Client and is incorporated into the Parties agreement by reference ("**Schedule of Accounts**"). All documentation and Invoices submitted to TBS, shall be subject to TBS's verification and approval. TBS may reject the purchase of any Account and/or for any Account purchased request cleaner and/or clearer documentation for timely processing of payments by TBS. All payments to You are subject to Your cooperation with providing acceptable documentation that is clearly legible and complete.

4.  **Schedule of Accounts**. The Schedule of Accounts, as updated from time to time by the Parties on an Exhibit B, shall list and identify all Accounts to be purchased and assigned to TBS. The Schedule of Accounts shall be conclusive evidence of the sale, assignment, transfer, and delivery of the Accounts set forth on the Schedule of Accounts to TBS. The ("**Discount Schedule**"), labeled as **Schedule A**, documents and lists the rates and pricing terms on which each Account will be assigned, transferred, sold, and/or purchased and other associated fees and charges connected with the purchase of the Accounts by TBS. The Discount Schedule incorporates these Terms of Service by reference and shall be used in all factoring transactions between TBS and Client, the discount fee is negotiated based upon certain known information at the time of agreement. The purchase of Accounts is subject to Client's or Client Customers' creditworthiness and the fact that such has not changed, as determined in TBS's sole discretion. If a change occurs in the status of Client or Client Customers, or increase to the Prime Rates then TBS may modify or change the Discount Schedule and such modification and/or change shall be effective upon notice to the Client.

5.  **Power of Attorney**. So long as purchased Accounts remain outstanding for payment and these Terms of Service are in effect, Client irrevocably appoints TBS as its attorney-in-fact, with full power to, among other things:

        a.     **Mail**.  Assert control and obtain access to Client's stream of mail or post office box, including executing documents on Client's behalf to affect such control at any U.S. Post Office; and, further to receive and open all mail addressed to Client, or to Client's business or trade name received at TBS's place of business or other mailing address.

        b.     **Endorsements**. Take any necessary action to negotiate checks, (or other negotiable instruments), for the payment of the Accounts sold or pledged to TBS that come into TBS's possession, including, but not limited to, supplying any necessary endorsement, endorsing the name of the Client, and depositing such payment into TBS's bank account(s), pursuant to the terms of these Terms of Service.

        c.     **Notify Client Customers**. Notify Client Customers that Client's Accounts have been assigned and/or transferred to TBS for processing and collection and TBS holds a priority security interest to such Accounts. TBS may direct the Client Customers to make payment of all Accounts (owed to Client), directly to TBS and to further forward Invoices directly to TBS or vice versa for processing.

        d.     **Authorization**. TBS may in Client's name or otherwise, demand, sue for, collect, prosecute, defend, compromise, settle, and/or give releases for any and all monies due or to become due on the Accounts. All authority granted TBS under the attorney-in-fact provision set forth in this Section 5 shall remain in full force and effect until all the Accounts are paid in full and any indebtedness of Client to TBS is fully and completely satisfied, in TBS's determination.

        e.     **Bank and Financial Institute Information.** TBS may obtain any and all information from any bank account of Client at any financial institution, including without limitation, all checks, deposit slips, monthly statements, wire transfer documents and any other information relating to Client's account.

6.     **Fee**.  The Parties agree that for each purchase of the Accounts listed on the applicable Schedule of Accounts, there shall be a fee paid to TBS as associated with the purchased Accounts and as indicated on the applicable Discount Schedule then in effect. This fee shall be earned immediately upon receipt of the Schedule of Accounts and may be collected or deducted by TBS from any payments due Client hereunder. All fees are nonrefundable.

7.     **Advance Policy**.  Client agrees any ability to receive advances directly from Client Customers shall be strictly limited and subject to TBS prior approval and these Terms of Service. Once TBS purchases the Accounts, Client shall not accept or purport to have authority to accept any advances on such Account from any Client Customer. Client must immediately notify TBS of any advances taken prior to purchase of the Accounts by TBS and any pay advances must be indicated on the Schedule of Accounts. If TBS has funded Client for a load upon which Client received an advance, without notifying TBS, Client shall be in default of these Terms of Service, Client understands and agrees that Client shall not be allowed to take any advances from a Client Customer on a load after the related Account is or agreed to be purchased by TBS. Should Client violate any provision of this section, Client shall immediately reimburse TBS for the full amount of the advance and pay an additional fee in accordance with section 22 of this agreement. The Parties agree the Discount Schedule fees regarding advances fairly represents the costs and expenses that TBS may incur resulting from Client's breach of this section and said percentage shall be considered a remedy and not deemed as a penalty in any nature whatsoever.

8.     **TBS is the Sole Owner**.  Upon delivery of the Schedule of Accounts and TBS's approval to purchase the Accounts, TBS shall become the sole and exclusive owner and holder of the Accounts and all proceeds whatsoever associated with the Accounts. The assignment and transfer of the Accounts by Client to TBS shall be deemed an outright ownership transfer from Client to TBS. In the event Client receives any payment or advance for all or part of the assigned and/or transferred Accounts, such amounts will be received in trust for TBS, and Client shall immediately notify TBS and deliver or transfer all cash, payments, checks, advances, or other negotiable instruments to TBS in accordance with Section 22 of this agreement. Client understands and agrees that all such payments, whether in whole or in part, belong to TBS and are the property of TBS, to which TBS has enforceable rights.

9.     **Events of Default**. The occurrence of any of the following acts or events shall constitute an event of default: (a) if Client fails to make any payment of any of the debt or any other monetary obligations owed to TBS when due; (b) if Client fails to make any remittance of funds, Accounts, documents, or otherwise as required by these Terms of Service; (c) if Client commits any breach of any of the terms, representations, warranties, covenants, conditions or provisions of these Terms of Service, or of any present or future supplement or amendment hereto or of any other agreement between Client and TBS; (d) if Client becomes insolvent or unable to meet Client's debts as they come due; (e) if Client delivers to TBS a false financial statement, provides false information, or provides any other false or misleading documentation or information to TBS or to any Client Customer; (f) if Client commences, whether voluntarily or involuntarily, any bankruptcy, insolvency, liquidation, dissolution or any other similar proceeding and such

is not dismissed within five (5) business days; (g) if Client suspends or discontinues doing business for any reason or if TBS receives reasonable information regarding Client's suspension, cessation, or discontinuance of business operations; (h) if a receiver or trustee of any kind is appointed for Client or appointed as receiving or trustee to any of Client's property; (i) if any guarantor of Client's debts or obligations shall become insolvent or have commenced by or against such guarantor any bankruptcy proceeding, insolvency, receivership or any other similar proceeding; (j) if any guaranty of Client's debts or obligations is terminated or such guarantor is determined to be unable to meet the obligations under the terms of an agreement; (k) if any change of ownership occurs with respect to more than forty percent (40%) of Client's capital stock, assignment or transfer of any material operating assets, or other similar units of ownership and such occurs without TBS's written consent; (l) if a notice of lien, levy, assessment is filed of record with respect to all or any of Client's assets or collateral by the United States or any department, agency or instrumentality having jurisdiction over Client's assets or collateral, or by any state, county, municipal or other governmental agency; (m) Client accepts money or funds that legally belong to TBS or factors loads with another factor other than TBS; or (n) grants any other party any interest in the Accounts or grants any other security interest in the accounts receivable of Client without TBS's written consent and authorization.

Upon the occurrence of any of the foregoing events ("**Event(s) of Default**"), TBS shall have the right to immediately demand all sums due and owing from Client on the Accounts be paid to TBS and/or TBS may terminate its relationship with Client for cause and seek all remedies available at law or in equity. Upon any termination of the Parties' relationship under these Terms of Service, TBS may terminate all other arrangements existing between Client and TBS upon notice without any liability, and Client's obligations to TBS shall mature, accelerate, and become immediately due and payable. TBS will attempt to give prior written notice to Client; however, to the extent TBS is at risk for any loss or liability whatsoever, then TBS may terminate the Parties' relationship immediately for cause to mitigate TBS's risk, liability, damage, and loss. As part of any termination or any Event of Default action, TBS shall have the right to withhold and apply any further payments generally due to Client to cover costs and expenses advanced, incurred on behalf of Client, or otherwise arising out of Client's breach, until all obligations of Client to TBS have remedied and obligations paid in full, as determined by TBS.

Under these Terms of Service, Client grants and TBS shall take a first priority security interest in Client's accounts receivables and the Accounts and shall have all rights of a first-priority secured party under the Uniform Commercial Code ("**UCC**"), including, without limitation, the right to take possession of any Collateral (hereinafter defined), in which TBS has a security interest and to dispose of such Collateral at public or private sale or auction, and Client will be responsible and liable for any deficiency. TBS shall not be required to proceed against any Collateral, (as defined below), but may, at its sole discretion, proceed against Client directly. TBS shall be entitled to seek the remedies provided for in these Terms of Service, in addition to any other remedies available at law or in equity, including injunctive relief and collections.

10. **Term.** These Terms of Service shall be binding upon Client and shall continue in full force and effect until terminated upon the mutual written agreement of the Parties or as provided herein. These Terms of Service shall have the minimum term as set forth in the Discount Schedule. Where no term is set forth, the term shall be for twelve (12) months from the Effective Date and shall annually automatically renew on the same terms and conditions for consecutive twelve (12) month terms, (collectively "**Term**"), unless (a) the Parties' relationship is earlier terminated in accordance with the terms herein, or (b) Client provides at least thirty (30) days' written notice to TBS prior to the end of the applicable initial or renewal term of such Party's intent not to renew these Terms of Service. TBS may modify these Terms of Service at any time by posting the changes, modifications, revisions, or revocation on the TBSFactoring.com website under legal terms and may terminate these Terms of Service for (i) an Event of Default or (2) upon thirty (30) days prior written notice to the Client.

11. **Notices**. Any notice required under these Terms of Service shall be delivered by (a) personal messenger and hand-delivered to an authorized representative of the respective Party; (b) sent by registered or certified U.S. mail or commercial delivery service with confirmation of receipt; (c) sent by confirmed electronic mail or facsimile to the authorized email address or authorized facsimile number provided by a Party; or (d) sent by reputable overnight courier to the designated address of the applicable Party. Notice will be effective when received when delivered personally, by facsimile, or by electronic mail; within three (3) business days of deposit in the U.S. mail; or on the next business day when sent by overnight courier and sent to the address provided herein or such other address as may be designated by a Party in writing.

12. **Termination and Termination Requirements**. For purposes of termination, any notice of termination must be in writing and acknowledged by TBS in writing to be effective. Client shall not be allowed to terminate these Terms of Service, so long as Client is indebted or obligated to TBS in any manner as described by these Terms of Service or any other agreement by and between Client and TBS. Notwithstanding any notice of termination, both Parties' respective rights and obligations arising out transactions having their inception prior to the specified date of termination shall not be affected by such termination and all terms, provisions and conditions hereof, (or any supplement or amendment hereof), including, but not limited to, the security interests herein above granted to TBS, shall continue in full force and effect until all debts obligations of Client to TBS have been paid in full. All representations, warranties, and covenants made herein shall survive the termination of these Terms of Service. In the event Client

terminates these Terms of Service prior to the expiration of the Term or if TBS terminates these Terms of Service due to an Event of Default by Client, Client agrees and acknowledges that it would be extremely difficult to ascertain the amount of actual damages to TBS. Client therefore agrees, in addition to the obligations set forth above, that any such termination shall result in liquidated damages, (not as a penalty), requiring Client to pay TBS the early termination fee of five percent (5%) the maximum credit line established by TBS and available to Client at the time of termination. (A Client may call and request their credit line amount at any time). The early termination fee must be paid before TBS can issue any release to Client, unless agreed to be waived by TBS in writing and authorized by an officer of TBS. Notwithstanding any termination of these Terms of Service, in addition to the other remedies available to TBS, Client may be required to pay TBS a UCC release fee, as indicated on the Discount Schedule, which the Parties agree equitably represents the costs and expenses TBS may incur in releasing the UCC filing, which is filed pursuant to these Terms of Service for security of Collateral.

Upon Client's satisfaction of all debts and obligations to TBS and following termination of these Terms of Service, (and not any time before), TBS will agree to provide Client a release letter stating that Client is no longer factoring with TBS and that payment of Client's Accounts should thereafter be remitted as directed by Client. It is Client's sole and absolute responsibility to promptly provide Client Customers with the release letter, new payment instructions and to make sure Client's instructions are subsequently followed. TBS may continue to receive payments from Client Customers on some Invoices even after Client has provided its Client Customers with new payment instruction and, in such an event, TBS may, at is sole option, either (i) forward to Client proceeds from payments received from Client Customers or (ii) return payments by Client Customers to Client Customers without any notice, liability, or responsibility to Client in respect thereof. In the event TBS forwards any such amounts to Client, Client shall indemnify and hold TBS harmless from and against any expense or liability sustained or incurred as a result of TBS remitting such proceeds to Client, and in the event that any such payment is sought to be recovered by the payor or a representative thereof (including a trustee in bankruptcy or assignee for the benefit of creditors on the grounds of preference), or any other party, then Client shall have the exclusive obligation, at its sole cost and expense, to contest, defend or settle such claim, and shall indemnify and hold TBS harmless from any loss or expense arising out of the assertion of such claim. To cover TBS's costs in handling payments received from Client Customers following termination of these Terms of Service, TBS, may, at its sole option, charge a reasonable processing fee.

13.     **Warranties**.  Client represents, warrants, and covenants to TBS that Client is the sole and exclusive owner of the Accounts and that the Accounts have not been previously sold, assigned, transferred, pledged, or otherwise encumbered in whole or in part, or in any other way nor will the Accounts be sold, assigned, transferred, pledged, or otherwise encumbered, in whole or in part without TBS's written consent. For so long as TBS hold a security interest in the Accounts, Client represents, warrants, and covenants that no Client Customers (or Account debtor) listed on any of the Accounts has, or will have, any right of offset, defense, quality claim, or any other claims or causes of action, which may give rise to any dispute, including claims of damage or demands, except as are disclosed in writing in documents attached to the Schedule of Accounts. Client further represents, warrants, and covenants that all work, goods, services, documentation, records, or other items required to make the Accounts presently due and owing have been provided, and there are no conditions, documentation, or events required to be performed or to be prepared prior to the maturity of the full amount shown for each of the Accounts listed on the Schedule of Accounts and that all Accounts are legally earned, due and owing. In the event any of the Accounts turns out to be fraudulent, or if TBS receives a "short pay," (e.g. only a partial payment and not payment in full as indicated on the Schedule of Accounts), or if the amount received by TBS is different than the face amount of the Account(s), as represented by the Client on the Schedule of Accounts, then Client shall be responsible for such fraudulent amounts, short-pay amounts, and be required to reimburse and/or pay TBS the entire amount and/or difference within five (5) business days of TBS notifying Client of such fraud or short pay. In determining amounts received by TBS in respect of any Accounts, it is understood and agreed that no payments made by any Client Customers "on account" shall be deemed to be in payment of any Accounts unless and until such items have been resolved by TBS and have been applied by it to the appropriate Accounts (and, if not so resolved within a reasonable period of time, Client agrees that TBS may, in its sole discretion, return any such "on account" payment to the payor thereof or escheat it to the proper governmental authority pursuant to the applicable abandoned property laws).  Client represents, warrants, and covenants that Client is a validly existing sole proprietor and/or commercial business with all required authorities, permits, insurance, licenses, and other authorizations required to operate Client's business (or will hereafter procure such and provide accurate and sufficient evidence to TBS satisfying the requirements herein). The representations, warranties, and covenants made herein shall survive any termination of these Terms of Service.

14.     **Disputes / Charge-Backs**.  In the event of any dispute related to these Terms of Service, or the failure or refusal of Client to pay any fees or amounts that become due and owing hereunder, TBS shall, in addition to its other legal, statutory, and/or contractual remedies, have the right to charge-back against the Client (including the Accounts or Client's bank account on record with TBS as a reverse ACH/wire or any other lawful means), any amounts due and outstanding, apply any funds held in reserve to the amounts owed, endorse instruments for payment to TBS to be applied to funds due from Client, and/or take any other legal actions at law or in equity to recover amounts owed from Client to TBS and/or enforce its legal and contractual rights. TBS shall not have any liability whatsoever to Client for any action or charge-back taken by TBS in good faith.

15. **Personal Guaranty**. As part of Client's obligations to TBS, TBS requires a personal guaranty. The undersigned guarantor(s) hereby absolutely, unconditionally, and irrevocably guarantees to TBS the due and punctual payment, performance, and discharge, of all debts, obligations and liabilities of the Client to TBS now existing or hereafter created or arising, whether direct, indirect, absolute, contingent, joint or several, under these Terms of Service, any modification hereof or any subsequent agreement by and between Client and TBS or under any subsequent or successive transactions between Client and TBS (collectively, the "Guaranteed Obligations"), together with any and all costs and expenses associated with the collection of all amounts owed by Client to TBS. Such amounts, fees, expenses, or costs may include, any court costs, reasonable attorneys' fees, or other costs or amounts associated with TBS enforcing its rights under these Terms of Service. The designated guarantor(s) specifically acknowledges and states that full and adequate consideration has been received for the guaranty granted under this section. This guaranty is a continuing guarantee of the Guaranteed Obligations The obligations hereunder are primary and independent of the obligations of the Client, and a separate action or actions may be brought and prosecuted against the guarantor(s), whether any action is brought against the Client or whether the Client is joined in any such action or actions. Guarantor(s) waives presentment, demand, protest, notice of dishonor, and notice of acceptance of this guaranty. Guarantor(s) also waives, to the extent permitted by law, all notices, all defenses and claims that the Client could assert, any right to require TBS to pursue any remedy or seek payment from any other person before seeking payment under these Terms of Service and all other defenses to the obligations set forth herein, except payment in full. TBS may at any time and from time to time, without the consent of, or notice to, the Guarantor(s), without impairing or releasing the obligations of the Guarantor(s) hereunder, upon or without any terms or conditions and in whole or in part: (1) change the manner, place or terms of payment, and/or change or extend the time of payment of, renew or alter, any of the Guaranteed Obligations, any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guarantee herein made shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered; (2) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the liabilities hereby guaranteed or any liabilities incurred directly or indirectly in respect thereof or hereof, and/or offset thereagainst; (3) exercise or refrain from exercising any rights against the Client or others (including the undersigned or under any other guarantee of the Guaranteed Obligations) or otherwise act or refrain from acting; and (4) settle or compromise any Guaranteed Obligation, any security therefor or any liability incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Client to creditors of the Client other than TBS. Guarantor(s) further understands and agrees that their obligation under these Terms of Service shall remain and follow any assets, collateral, surviving interests, transfer, or sale of the Client company (regardless of any consent or failure to notify Guarantor(s)).

16. **Release and Indemnification**. Client, on its own behalf, and on behalf of its affiliated entities, successors, transferors, heirs, and assigns, does hereby release, discharge and forever acquits TBS, its parent, affiliates, subsidiaries, divisions, directors, officers, stakeholders, owners, agents, representatives, officers, directors, and employees, from any and all claims, demands, costs, damages, losses, liabilities, attorneys' fees, and causes of action whatsoever, whether known or unknown, liquidated, unliquidated, disputed, undisputed, legal or equitable which Client, had, now has, or hereafter may have against TBS arising out of, connected directly or indirectly with, or relating in any way to Client's business relationship with TBS and TBS's exercise of any and all rights granted to it herein. Client hereby agrees and acknowledges that the matters released herein are not limited to matters, which are known or disclosed, and Client hereby waives any and all rights and benefits which it now has, or may have in the future, conferred upon it. TBS may make available to Client additional services beyond factoring, including some provided or administered by third-parties, Client expressly agrees that the release of liability shall include any ancillary services. These include the TBS Fuel Finder, offers of discounted ELD's, the TBS Load Board and any other services including those not yet contemplated. TBS DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE; NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE SERVICES, TBS disclaims all warranties, express or implied, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose and non-infringement.

17. **Limitation of Liability**. In no event shall TBS be liable to Client, its owner, co-owners, officers, managers, directors, or any other third party for any consequential, direct, indirect, special, incidental, or punitive damages. Under no circumstances, does TBS assume or agree to be responsible for any fraud, negligence, or other misrepresentations on the part of Client, it affiliated entities, officers, owners, co-owners, employees, managers, representatives, or agents and TBS expressly disclaims any such liability or responsibility whatsoever and for whatever cause.

18. **Confidentiality.** The Parties agree that during the Term, the Parties will engage in the exchange of confidential and proprietary information. The Parties agree to use reasonable measures to protect the other Party's Confidential Information. "Confidential Information" is defined as all records, data, files, information, agreements, and documentation of either Party and the operations, strategies, terms of agreements or services, schedules, exhibits, attachments, procedures, policies, practices, trade secrets, trademarks, copyrights, applications, systems, forms, do-it-yourself guides, pricing, products, services, and other confidential and proprietary information of TBS. The Parties agree not to disseminate, distribute, copy, or otherwise make available any Confidential Information to any third parties, except as required to fulfill the obligations of these Terms of Service or as required

for a Party's legal and financial advisor(s). Client agrees not to use TBS Confidential Information or adapt, copy, circumvent, or modify TBS Confidential Information for its own personal use or allow any use by a third party.

19. **Security Interest**. Client hereby grants, as security for the timely performance of all of Client's obligations hereunder and the payments due TBS under these Terms of Service, a continuing priority security interest in the following property of Client:

> All presently existing or hereafter arising, now owned or hereafter acquired accounts, accounts receivable, contract rights, documents, reserves, reserve accounts, rebates, and general intangibles, and all books and records pertaining to Accounts and all proceeds of the foregoing property, (including any identified (with a detailed description) equipment, trucks, or trailers owned by Client, as documented separately in writing), ("**Collateral**").

Client hereby authorizes TBS to perfect a lien against the Collateral in favor of TBS and Client further authorizes TBS to file a UCC-I Financing Statement, continuation statements, and amendments wherever TBS desires without the Client's signature or further authorization. Client further authorizes TBS to file any other documents, which TBS may deem necessary to perfect or evidence its security interest in the Collateral and Client agrees to sign any such documentation as deemed necessary for TBS to perfect it secured interest rights. Notwithstanding the repayment of debts and obligations of Client or termination of these Terms of Service, TBS shall not be required to record any termination or satisfaction statements of any of TBS's liens on the Collateral, unless and until Client has executed and delivered to TBS a general release in a form reasonably satisfactory to TBS. Client understands and agrees that the preceding provision constitutes a waiver of its rights under § 9-513 of the Uniform Commercial Code. Client will take no action to interfere with TBS's ability to perfect or maintain perfection of its ownership interests or security in the Accounts, or TBS's security interest in the Collateral. TBS may file financing statements, continuation statements and amendments that include and describe the Accounts and Collateral as "all assets" of Client or similar words and which contain any other information required by the UCC, regardless of whether such assets are identified as Collateral in these Terms of Service. In the event Client allows any other third-party to interfere with TBS's interest, then Client shall be fully liable for all costs and expenses incurred by TBS (including court costs and attorney fees) to protect its rights with respect to Client's obligations and such will be payable upon demand to TBS.

20. **Claims, Taxes, Liens, Inspection**. Except for amounts being contested in good faith, Client shall pay, before delinquency, and be solely responsible for all taxes, license fees, and other such assessments on or against the Collateral or its use and shall pay all other taxes, liens, assessments, and charges relative to Client's business and operations when due. Client shall keep the Collateral free of all liens and encumbrances, except the TBS's lien on the Collateral. Client hereby agrees to defend, hold harmless and indemnify TBS (including its affiliated entities, owner, officers, directors, representatives, and employees), from all claims arising from or related to these Terms of Service, the Accounts and the Collateral, including any tax claims or other similar assessments against the Collateral or the Client's business or operations. TBS and its representatives, employees, and agents shall have the right at all reasonable times during Client's business hours to inspect the Collateral and inspect, audit, and copy any books and records of Client relating to the Collateral.

21. **General Provisions**. The following general provisions apply:

   a. **Costs and Attorney Fees**. In the event of any legal action concerning or arising out of these Terms of Service, including the collection of any monies due, the prevailing Party shall be entitled to reimbursement by the other Party of all expenses and costs, including reasonable attorneys' fees, expert fees, and court costs incurred in enforcing these Terms of Service. The prevailing Party shall be deemed to be the Party who receives a favorable judgement or ruling on such Party's cause of action or defense from the authorized applicable tribunal or jurisdictional court hearing the dispute. The amount of any attorney or expert fees awarded to the prevailing Party shall be reasonable, as determined by the forum finally deciding the controversy, and shall include reasonable fees for preparation, discovery, trial, arguments, filings, and any appeal from a trial, whether for collection of amounts due, enforcement of these Terms of Service, or enforcement of any rights or remedies created hereby. Client agrees to defend, indemnify, and hold TBS and its affiliates and all of their owners, officers, managers, directors, employees, and representatives harmless from and against any and all claims, liabilities, damages, causes of action, penalties, fees, costs, and expenses (including attorney and court fees), which may be claimed against, imposed, or filed upon, or asserted against TBS or any individual employee for any acts and omissions of Client (including negligence or fraud), or in connection with Client's performance under these Terms of Service.

   b. **Enforceability**. If any provision(s) herein is held to be invalid, illegal or unenforceable in any way, the remaining provisions shall nevertheless continue in full force and effect without any impairment or invalidation. Any provision deemed to be invalid, illegal, or unenforceable will be renegotiated by the Parties to create a binding, valid and enforceable provision which most closely resembles the Parties' original intent, and such new negotiated binding provision, when taken with the remaining terms and conditions shall have full force and effect.

   c. **Complete Agreement**. These Terms of Service and the instruments, documents, and schedules incorporated by reference, represents the entire, final and complete agreement of the Parties, and supersedes and replaces any and all prior agreements, discussions and representations, whether written or oral, made or existing between the Parties or their respective representatives concerning the specific subject matter of these Terms of Service and the Accounts. The Parties agree that there were no inducements or representations involved in agreeing to these Terms of Service. These Terms of Service may only be altered, changed, amended, modified, revised, or otherwise replaced, except by TBS and posted in writing on the TBSFactoring.com website.

   d. **Authorization**. The Parties represent that they are fully authorized to agree to the Terms of Service (including any exhibits, schedules, or amendments hereto), as set forth by the applicable Party's company records. The Parties represent and warrant that there are no additional entities or persons affiliated with any of the Parties hereto who are necessary to effectuate the terms of the Parties' agreement. The Parties further represent and warrant that they are agreeing to these Terms of Service voluntarily, without duress, with the consultation and advise of legal counsel of their choice, (or upon a voluntary waiver of the right to such consultation and advice), and with a full understanding of the terms set forth herein.

   e. **Governing Law, Forum Selection and Waiver of Jury Rights**. These Terms of Service shall be interpreted and construed in accordance with the laws, statutes, guidelines, and rules of the State of Oklahoma. Any dispute, action or proceeding arising out of or relating to these Terms of Service or any other documents or instruments of the Parties shall be within the exclusive jurisdiction of the U.S. Western District Court of Oklahoma or in Oklahoma County, Oklahoma. Client consents and agrees to personal jurisdiction in the State of Oklahoma and acknowledges that this agreement is being accepted and conducted in the State of Oklahoma. Client knowingly and intentionally waives all rights to a jury trial in any action involved that arises from or involves the relationship of the parties.

   f. **No Successor Interests**. These Terms of Service shall be binding upon each of the Parties and their respective successors, heirs, devises and assigns, provided, however, the Client shall not and shall have not authority to sell, subcontract, assign, transfer, or otherwise convey in any manner any interest or obligation of Client under these Terms of Service. Any wind-down, sale, assignment, transfer, change in ownership, or other dissolution of Client's material operating assets or business operations to any third-party (including family members, partners, or successors in interest) without TBS's written consent shall be considered an Event of Default under these Terms of Service. Notwithstanding anything to the contrary the original Client principals, owners, or personal guarantors will not be absolved of any liability whatsoever for any assignment, sale, transfer, dissolution, or change in ownership of the Company, except with TBS's written consent signed by an authorized officer. Any successors-in-interest (whether authorized or not) shall become fully liability for the fulfillment of all obligations and responsibilities of Client under the Terms of Service.

   g. **Electronic Consent**. Client hereby agrees and consents to the fact that TBS's electronically stored information, communication, documentation, or otherwise, shall be admissible as and into evidence, without objection, as prima facie evidence of the status of all Accounts purchased by TBS, non-purchased Accounts, reserves, account debtors, Collateral, security interests, obligations, and Client's other rights and obligations.  All such electronically stored information maintained by TBS shall be deemed conclusively accurate and binding on Client, unless within five (5) business days after the first of each month Client notifies TBS of any inaccuracy or discrepancy in respect to such electronically stored information as contained and available for review on TBS's website. Such notification shall be sent by registered or certified U.S. mail, prepaid, and must set forth with specificity the reasons why Client believes such electronically stored information is inaccurate, as well as what Client believes to be the correct amount(s) or information as documented by sufficient evidence.  Client's failure to access or dispute any electronically stored information shall not relieve Client of the responsibility to timely issue the required notification herein and any failure of Client to do so shall nonetheless bind Client to TBS's electronically stored information, documentation, and reports.  TBS will reasonably investigate any inaccuracies communicated in writing by Client and provide Client with period updates on the status of TBS's research and investigation into Client's claim. TBS shall have the final determination on the accuracy of information.

   h. **Electronic Storage**. Client hereby authorizes TBS to preserve, scan, and/or make computer images of or to dispose of any information, bills, documents, schedules, invoices, or other papers delivered to TBS related to these Terms of Service and to electronically store such with the understanding that such electronically stored information shall have the same force and effect as original instruments and documents.

   i. **Liability**. Client shall remain fully liable to and responsible for all suppliers, contractors, or other third-parties Client may utilize in the performance of Client's business operations and for any interference by any such third-parties in conflict with the Terms of Service. Client shall be responsible for all payments to such third-parties.

22. **Agreement for Factored Payments Received by Client**. If Client receives a payment (or any advance), whether in whole or in part, from a Client Customer for any TBS purchased Account, such payment belong solely to TBS and Client shall immediately

notify and remit payment to TBS. Client agrees that it shall not deposit any such funds into any of Client's bank accounts, cash, or otherwise negotiate the check to Client's favor. Client shall handle the Client Customer payment received in the following manner:

      a.    Immediately electronically submit or fax an image of the check and its stub and other relevant information on the payment, (or other negotiable instrument) to TBS Factoring Service, LLC (fax no. 405-528-4493). Include a note indicating how Client is delivering the payment to TBS (regular mail, priority mail, overnight, or hand delivery); and

      b.    Deliver or cause the delivery of the payment, check, (or other negotiable instrument), as indicated in the section immediately above to TBS. Client's account with TBS will be credited for the payment as being received on the same business day TBS physically receives payment and/or confirmation of payment is received by TBS and not when Client notified TBS of the payment. Client may remit payments in accordance with the following delivery methods:

| Mail and Priority Mail: | Overnight or Personal Delivery: |
|---|---|
| TBS Factoring Service, LLC | TBS Factoring Service, LLC |
| P. O. Box 18109 | 7440 NW 85th Terrace |
| Oklahoma City OK 73154 | Oklahoma City OK 73132 |

      c.    To avoid improperly routed payments in the future, Client should immediately contact the Client Customers' accounts payable department to thank them for the payment and remind them to send future payments to Client's accounts receivable remittance address in care of TBS at address provided by TBS.

Remit Payments To:<br>
TBS Factoring Service, LLC<br>
PO Box 248920<br>
Oklahoma City, OK 73124-8920

Client agrees to immediately forward all payments received for purchased Accounts to TBS, as directed above. Client understands and agrees that by depositing or cashing such payments Client is committing a breach of these Terms of Service, to which shall entitle TBS to certain default remedies as provided herein. A default of these Terms of Service may result in additional indirect, direct, consequential, special, and punitive damages due from Client. TBS reserves the right to charge Client an additional fee of fifteen percent (15%) for any improperly deposited or cashed payments or misdirected payments. If any payment, to which TBS is entitled, is received by Client through direct deposit, ACH or otherwise deposited into Client's account, then Client shall be responsible for (i) reversing payment and/or (ii) causing such payment to be remitted to TBS; if Client fails to reverse such ACH, then TBS shall have the authority to order a reverse ACH to receive the funds.

23.    **Discount Schedule**.  The discount earned by TBS for purchasing Client's Accounts is indicated on the Discount Schedule, Schedule A. Accounts purchased by TBS from Client may be with recourse or without recourse to Client and such is indicated on the Discount Schedule. Client will not enter into any agreement with Client Customers, which provide payment terms exceeding a period of thirty (30) days from Client Customer's receipt of Client's Invoice for payment.

24.    **Exclusivity**. During the Term, TBS shall be the sole and exclusive purchaser and/or factor for Client's Accounts and Client agrees not to sell, factor, or otherwise finance its accounts receivable or any Accounts. Nothing under these Terms of Service shall limit TBS's rights to offer similar deals, products, and services to other clients or to purchase accounts receivables from other clients or third-parties.

25.    **Authorization**. Client authorizes TBS to conduct applicable background and credit checks and/or verify and check the credit of Client and verify any other information necessary for the performance of Client to fulfil the obligations under these Terms of Service. Client acknowledges that TBS is not considered a "financial institution" as such term is defined by applicable law. Client grants TBS all the powers and rights provided in these Terms of Service. Client represents that is has read, understands, and agrees to the terms and conditions of this Accounts Receivable Purchase and Security Agreement Terms and Conditions that is incorporated by reference into the applicable schedules signed by Client.

# AUTHORIZATION

By completing this authorization and signing, the persons whose names appear below agree to be bound by the terms and conditions of this application, as well as the terms of service for the Accounts Receivable Purchase and Security Agreement Terms and Conditions, ("**Terms of Service**"), which have been provided to you along with this application. The Terms of Service are incorporated by reference and are binding upon you and the Company. As part of the Terms of Service, a personal guarantor is required, and the personal guarantor identified below agrees to be bound by the Terms of Services and the provisions herein just like all owners, principals, members, or officers of the Company. For services rendered, the undersigned agrees that TBS or its agent may file a Uniform Commercial Code (UCC) financing statement against Company's accounts receivable and other collateral to preserve its security interest wherever necessary to evidence the security interest of TBS in accordance with the Terms of Service.

**Authorization and Personal Guarantor(s)**

| Name | Title | Signature | Date |
|---|---|---|---|
| Ashley Williams | Manager | *Ashley Williams* | 7/20/2020 |